# DOWELL *v.* APPLEGATE.

ERROR TO THE SUPREME COURT OF THE STATE OF OREGON.

No. 209. Argued January 18, 1894.—Decided March 5, 1894.

A final decree of a Federal court, being unmodified and unreversed, cannot be treated as a nullity when assailed collaterally by one who was a party to the suit in which it was rendered.

In a suit by A to subject lands of B to sale in satisfaction of his claims, a decree in the complainant's favor is final, if not appealed from, and B cannot have the same issue retried in an independent suit, based upon a title which he might have set up in the first suit, but did not.

When the Supreme Court of a State fails to give proper effect to a decree of a Circuit Court of the United States, this court has jurisdiction over its judgment to correct the error.

THE case is stated in the opinion.

*Mr. B. F. Dowell* and *Mr. John H. Mitchell* for plaintiff in error.

*Mr. J. N. Dolph* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This case involves the title to a tract of land in Douglas County, Oregon, containing forty acres, part of what is known

as the donation land claim of Jesse Applegate, number thirty-eight, in township twenty-two south, of range five west of the Willamette meridian.

The defendant in error, Daniel W. Applegate, holds under a deed executed to him by William H. H. Applegate and wife, dated October 8, 1874, and recorded October 31, 1874. He brought this suit in the Circuit Court of Douglas County, Oregon, to obtain a decree removing the cloud upon his alleged title created by a deed made to the defendant Dowell by a master in chancery, pursuant to an order of the Circuit Court of the United States for the District of Oregon, in a suit determined by that court in which Dowell was plaintiff and Daniel W. Applegate was one of the defendants. At a sale held in conformity with the final decree in that suit, Dowell became the purchaser of the land in question. That sale was duly confirmed, and a deed executed to him. From that decree of sale no appeal was taken.

Dowell bases his claim to the land upon the decree and orders in the above suit in the Circuit Court of the United States; and the controlling question before this court is as to the effect of that suit.

The state court did not give to the decree and orders in the Federal court the effect claimed for them; and it is necessary to a clear understanding of the grounds upon which it refused to do so, that we ascertain the precise nature of the proceedings in the latter court.

From the recitals in a supplemental bill filed by Dowell in the suit in the Federal court, it appears that that suit was commenced on the 11th day of October, 1879, in the Circuit Court of Douglas County, Oregon, and was subsequently removed into the Circuit Court of the United States for the District of Oregon. Upon whose application, or upon what grounds, it was so removed, the record before us does not clearly show. But it does appear that Dowell, on the 6th day of April, 1881, in order to conform his pleadings to the practice in the courts of the United States, sitting in equity, filed a bill in the Federal court disclosing the grounds of his suit. The defendants were Jesse Applegate, and his wife.

Cynthia Ann Applegate, William H. H. Applegate, Daniel W. Applegate, Peter Applegate, Sallie Long, John C. Drain, Jonas Ellensberg, and Charles Putnam.

The bill filed by Dowell made the following case: In a suit brought on the official bond of one May, Secretary of State of Oregon, executed September 6, 1862, — his sureties being Jesse Applegate, O. Jacobs, and James Kilgore, — judgment was entered, June 24, 1874, in favor of the State for the sum of $1622.50, and the costs, expenses, and disbursements of the action. That judgment was unsatisfied in whole or in part when Dowell brought his suit.

On the 4th day of August, 1874, in a suit instituted in the Circuit Court of Marion County, Oregon, against Dowell and Jesse Applegate, who were sureties on the official bond of May, dated August 4, 1866, for another term of the office of Secretary of State, the State recovered judgment for the sum of $8929.85, together with the costs, expenses, and disbursements of the action. That judgment was duly entered August 11, 1877, on the judgment-lien docket of Douglas County. Prior to June 27, 1878, Dowell paid on it the sum of $10,837.75; and, on that day, he recovered a judgment in the Circuit Court of Douglas County against Jesse Applegate, as his co-surety, for the sum of $4882.19; with costs, expenses, and disbursements. That judgment was also, and on the day of its rendition, entered on the judgment-lien docket of Douglas County.

A balance of $1385.61 due the State on its judgment was paid by Dowell, November 16, 1878. He gave notice, November 28, 1878, in conformity with the statutes of Oregon, that he claimed the benefit of the judgment of the State against Jesse Applegate for contribution for said sum, with costs and expenses, and that notice was duly entered of record. An execution was issued April 4, 1879, on the State's judgment, with costs, etc., and under it the lands levied on were sold, May 31, 1879, to Jesse Applegate for upwards of $1200. This left due to Dowell on that execution $284.61, with interest from May 31, 1879.

The amount due Dowell, January 1, 1881, from Jesse Apple-

gate, on both of the above judgments, with interest and costs, was $6584.09. Execution was issued, September 17, 1879, in his favor for $4882.31, and was duly returned "no property found." A second execution issued October 7, 1879, with a like result.

Jesse Applegate was, at one time, the owner in fee of the north half of a donation land claim, with a life estate in the south half that had been set apart to his wife — such claim having been taken up in 1849 under the laws of the provisional government of Oregon, and afterwards under the act of Congress, approved September 27, 1850, entitled "An act to create the office of surveyor-general of the public lands in Oregon and to provide for the survey, and to make donations to settlers, of the said public lands." The tract of land so taken up contained 642 acres, and was known on the surveys and maps of the United States as Jesse Applegate's donation land claim No. 38, in township 22. He was, also, the owner of other lands in Douglas County, Oregon.

Dowell's bill referred to deeds purporting to have been executed in 1867 and 1869 by Jesse Applegate and wife to W. H. H. Applegate, Daniel W. Applegate, Peter Applegate, Sallie Applegate, and Charles Putnam — children and grandchildren of the grantors — for lands aggregating more than a thousand acres, a large part of which was within the above donation claim. It also referred to a deed executed June 24, 1871, by W. H. H. Applegate, conveying to Charles and John C. Drain, for $2000 in cash paid, 200 acres in the south half of that claim.

In respect of all of the above deeds the charge was that they were fraudulent and void as against the State of Oregon and Dowell; that the respective deeds to William H. H. Applegate and Daniel W. Applegate, dated in 1867, were antedated for the purpose of deceiving, cheating, delaying, and defrauding the State and Dowell, and were, in fact, not made and delivered until 1869. In respect to the deed of June 24, 1871, the charge was that the price paid by the grantee was $2000, "yet the deed, to conceal the value of the land and to cheat and defraud the creditors of Jesse Applegate

and to make the price correspond with the said deed of Jesse Applegate and his wife to the said William H. H. Applegate, on its face only expresses the consideration of $500, and it, in place of having a revenue stamp of $2, as was required by the act of Congress at the date of said deed, only has a revenue stamp of 50 cents on it." Dowell's bill also averred that all of said deeds were "illegal and a fraud under the statute of the United States entitled ' An act to provide internal revenue to support the government and to pay interest on the public debt,' approved 30th day of June 1864, and the amendments thereunto; that an inadequate consideration was expressed in each of said deeds by the grantors and grantees with the intent of evading the provisions of said statute; that the grantors and grantees well knew the land conveyed by each deed was at the date thereof worth in cash more than $1000, and each of them have a revenue stamp on them of 50 cents and no more, not one-half the amount required by said act of Congress, and the recording of each of them was in violation of the spirit-meaning of sections 152, 156, and 158 of said statute; that none of said stamps have been cancelled by writing the date when the deed was so used or stamps affixed on the same, and none of them have the initials of the person using them or affixing the same prior to the placing said deed on the records of Douglas County in the State of Oregon."

The relief sought by Dowell was a decree declaring the above-mentioned deeds to be illegal, fraudulent, and void as to him; ordering the sale of the lands described in the bill under the judgments in favor of himself and the State; that an account be taken of the rents, issues, and profits of each tract for the six years preceding the commencement of the suit; that the grantees be compelled to pay the rents, issues, and profits on the tracts severally deeded to them; and that plaintiff have such other relief as in equity and good conscience was proper.

Daniel W. Applegate, May 2, 1881, filed an answer to Dowell's bill, putting in issue most of its material allegations and denying that Dowell was entitled to the relief asked for in the bill. He denied that his deeds, or either of them, were

" a fraud under the statutes of the United States or any stat-
ute relating to internal revenue," or that the consideration
was expressed in either of them with an intent to evade the
provisions of that or any other statute.  He admitted that
each deed made to him had on it a stamp of fifty cents only,
but alleged that stamps were put on each in good faith and
without any intent to evade the requirements of the statute
of the United States, and that the recording of such deeds
was not in violation of any law.

He made no reference in his answer to, and, so far as the
record before us discloses, did not introduce in evidence, the
deed for the forty acres made to him, October 8, 1874, by
William H. H. Applegate, *although that deed is made by his
bill in the present action the foundation of his claim to that
tract.*

By the final decree in Dowell's suit, rendered January 5,
1883, it was adjudged that on and prior to April 19, 1869,
Jesse Applegate and Dowell were jointly and severally liable
to the State of Oregon in the sum of five thousand and five
hundred and forty-six dollars, as sureties on the official bond
of August 4, 1866, of May, Secretary of State, by reason of
the defalcation of that officer, which sum was equal to the
value of all the property and assets then owned and possessed
by Jesse Applegate ; that there was due to Dowell, on the
accounts mentioned in his bill, $7488.48, for which sum with
interest, he, by virtue of his judgment obtained June 27, 1878,
had a lien upon all the real property of Jesse Applegate, in
Douglas County, from and after the entry and docketing of
that judgment; that " on and prior to April 19, 1869, Jesse
Applegate was the owner in fee simple of 121.55 acres of the
north half of the donation claim numbered thirty-eight;" that
" the conveyance of said 121.55 acres by said Jesse Applegate
to his sons William H. H. Applegate and Daniel W. Apple-
gate, by deeds dated April 19 and 20, 1869, respectively, was
voluntary, and without valuable consideration, and in fraud
of the rights of the plaintiff herein, and is, therefore, as to
him and his assigns, declared to be null and void." The
decree also declared void, as against Dowell and his assigns,

a deed to Peter Applegate for two tracts containing together 41.31 acres, deeds to Daniel W. Applegate and Peter Applegate for 225 acres in the south half of the above donation claim, and a deed to Sallie Applegate.

The decree further provided that unless Jesse Applegate, Peter Applegate, Daniel W. Applegate, William H. H. Applegate, and Sallie Applegate paid the sum adjudged to be due to Dowell, within a named time, the master of the court should sell, as upon execution at law, *all the interest of Jesse Applegate in the above-mentioned tract of* 121.55 *acres*, and in the lands embraced in the deeds to Peter Applegate and Sallie Applegate, containing, respectively, 41.31 and 160 acres, and that the purchaser should be entitled to the possession of the premises purchased, upon the receipt of the master's conveyance therefor. *The tract in dispute is part of the tract of* 121.55 *acres.* The bill was dismissed as to Putnam and Ellensberg.

In respect to a conveyance to William H. H. Applegate for 160 acres in the north half of the. donation claim numbered 38, and the conveyance of the same date to Daniel W. Applegate of 146 acres in the south half of that claim, they were held to be valid, the court finding that they were made in good faith, and at a time when the grantor was otherwise able to meet his pecuniary obligations.

A sale took place under the decree of the Federal court on the 26th of April, 1883, Dowell becoming the purchaser of the lands, ordered to be sold, at the price of $7400. The sale was in all things confirmed by the court, and the master, December 6, 1883, pursuant to its order, made and acknowledged a deed to Dowell, which was duly approved, was acknowledged March 28, 1884, and recorded August 19, 1884.

The present suit was brought by Daniel W. Applegate on the 17th day of August, 1886, — more than three years after the decree in the Federal court, — for the purpose, as we have already stated, of obtaining a decree enjoining Dowell from asserting any title or claim, by virtue of the latter's deed under the decree of the Federal court, to the tract of 40 acres conveyed to the plaintiff herein by William H. H. Applegate,

by deed dated October 8, 1874. The bill, admitting *that that tract was embraced in the deed made by the master to Dowell*, avers that the conveyance by William H. H. Applegate to Daniel W. Applegate was prior in time to the commencement of the suit in the Federal court, and its validity was in nowise put in issue or determined by the decree of that court.

The answer of Dowell, in the present suit, as stated at the outset, bases his claim upon the decree of the Federal court and the sale under it at which he purchased. Referring to the deeds made by Jesse Applegate to his sons William H. H. Applegate and Daniel W. Applegate, the answer charges that they were made with the intent to cheat, delay, and defraud the State of Oregon and the defendant; and that those deeds, as well as the deed from William H. H. Applegate to Daniel W. Applegate, were without any valuable consideration whatever; and that defendant purchased the land in question without any actual notice of the latter deed. The answer further avers that the deed, under which plaintiff now claims the tract of 40 acres, was put in issue in the suit in the Federal court, and was determined by the decree of that court.

The reply of Daniel W. Applegate controverts all the material allegations of Dowell's answer and denies that the Circuit Court of the United States for the District of Oregon had any jurisdiction to hear and determine the suit brought by Dowell, or to render the decree under which the lands here in question were sold.

Upon the hearing of the present cause in the Circuit Court of Douglas County, the bill was dismissed, the court being of opinion that the decree of the Federal court in the suit brought by Dowell was a bar to the present one. This decree was reversed by the Supreme Court of Oregon. *Applegate* v. *Dowell*, 15 Oregon, 513. Upon a second trial of this cause in the court of original jurisdiction, there was a decree in favor of Daniel W. Applegate, which decree, upon the appeal of Dowell, was affirmed upon the authority of the previous decision in the Supreme Court of Oregon. *Applegate* v. *Dowell*, 17 Oregon, 299. Among the findings of the Circuit Court of Douglas County, at the last trial of this case, were

the following; "That no evidence was offered or admitted sustaining or tending to sustain the allegations in the answer of defendant [Dowell], that the plaintiff and his brother William H. H. Applegate, at the time of the deed of Jesse Applegate to William H. H. Applegate, and the pretended deed from William H. H. Applegate to plaintiff, well knew that Jesse Applegate was largely indebted to the State of Oregon as one of the sureties of S. E. May, late Secretary of State, and both of said deeds were made with the intent to cheat and defraud the State of Oregon and B. F. Dowell, one of Jesse Applegate's co-sureties, out of said debt; that the said William H. H. Applegate and Daniel W. Applegate received said deeds with the intent to cheat, delay, and defraud the State of Oregon and B. F. Dowell out of said debt; that both of said deeds were made and delivered to William H. H. Applegate and Daniel W. Applegate without any valuable consideration whatever; and that the deed of William H. H. Applegate to his brother Daniel W. Applegate was made and delivered without any valuable consideration whatever, or any of said allegations." The Circuit Court of Douglas County, for that reason only, found those allegations and each of them to be untrue.

From this history of the litigation between the parties, it appears that Dowell, in his answer in this suit, asserted his right to the forty acres in dispute under and by virtue of the decree and proceedings in the Circuit Court of the United States. That right having been denied by the judgment of the Supreme Court of Oregon, affirming the judgment of the Circuit Court of Douglas County, it is necessary to inquire —

*First,* whether the decree and proceedings in the Federal court were, as claimed, void for the want of jurisdiction to hear and determine the suit which was instituted by Dowell in the Circuit Court of Douglas County, Oregon, and was subsequently removed into the Circuit Court of the United States for the District of Oregon;

*Secondly,* whether, if such decree and proceedings were not void, the state court gave due effect to them, when adjudging

that Dowell took nothing by his purchase of the lands in dispute under that decree.

If these questions be determined in favor of Dowell, then the judgment below was erroneous in that it denied a right specially set up and claimed by him under the authority of the United States.

1. Dowell, we have seen, brought his suit in the Circuit Court of Douglas County on the 11th day of October, 1879, and his bill in the Federal court, which took the place of the bill filed in the state court, was filed April 6, 1881. The present transcript does not contain all the proceedings in the Circuit Court of Douglas County prior to the removal of the cause into the Federal court. Nor does it contain the petition for removal. But the state court below had before it, in the present suit, the bill filed by Dowell in the Federal court, April 6, 1881, his supplemental bill of September 25, 1881, the answer of Daniel W. Applegate of May 2, 1881, and the final decree of January 5, 1883: It was also informed, by the findings of fact in the Circuit Court of Douglas County, of the sale made by the master in chancery under that decree, the confirmation of that sale by the court, the execution of the deed to Dowell, and that the tract described in Applegate's complaint in this suit is a part of the premises described in the above decree of sale and in the master's deed to Dowell.

In the bill and supplemental bill of Dowell, he and the defendants to the suit in the Federal court are described as citizens of Oregon. But there is no finding, nor anything in the present transcript, showing the citizenship of the parties at the time Dowell brought his suit in the state court, nor at the time of the filing of the petition for removal. It is therefore contended that this court cannot assume that the parties to the suit in the Federal court were all citizens of Oregon at the time that suit was brought, or when it was removed from the state court. *Stevens* v. *Nichols,* 130 U. S. 230 ; *Crehore* v. *Ohio & Miss. Railway,* 131 U. S. 240 ; *La Confiance Compagnie* v. *Hall,* 137 U. S. 61.

If it be assumed that all the parties to Dowell's suit were

citizens of Oregon when it was commenced, as well as when it was removed into the Federal court, — and such, probably, was the case, — it is yet quite apparent that jurisdiction was taken by that court on the ground that the deeds by Jesse Applegate and wife which obstructed Dowell in his efforts to reach the lands described in them, were charged to have been insufficiently stamped under the acts of Congress then in force providing internal revenue for the support of the government and to pay the interest on the public debt, and that the failure to put sufficient stamps on those deeds and to properly cancel them was with the intent to evade such acts. We may so interpret the record, because in the opinion of Judge Deady, in *Dowell* v. *Applegate, &c.,* 7 Sawyer, 232, 239, when that case was before the Federal court upon demurrer interposed by some of the original defendants, he stated that the removal to the Federal court was " on the ground that its determination involved the construction of certain provisions of the internal revenue act of June 30, 1864, c. 173, 13 Stat. 223, and the amendments thereto."

It thus appears, upon the face of the record of the suit in the Federal court, that the case depended, in part, upon the construction of certain acts of Congress, and upon the effect of the alleged fraudulent omissions of the grantors in the deeds attacked to conform to those acts. If all those deeds were void, by reason of such omissions, then the difficulties in the way of Dowell's reaching the lands embraced by them would probably have disappeared.

If the Federal court erred in assuming or retaining jurisdiction of Dowell's suit, — a question not necessary to be examined, — would it follow that its final decree, being unmodified and unreversed, can be treated as a nullity when assailed collaterally by one who was a party to the suit in which it was rendered ?

In *Kempe's Lessee* v. *Kennedy,* 5 Cranch, 173, 185, it was said by Chief Justice Marshall that " all courts from which an appeal lies are inferior courts, in relation to the appellate court before which their judgments may be carried ; but they are not, therefore, inferior courts in the technical sense of those

words. They apply to courts of a special and limited jurisdiction, which are erected on such principles that their judgments, taken alone, are entirely disregarded, and the proceedings must show their jurisdiction. The courts of the United States are all of limited jurisdiction, and their proceedings are erroneous if the jurisdiction be not shown upon them. Judgments rendered in such cases may certainly be reversed, but this court is not prepared to say that they are absolute nullities, which may be totally disregarded."

In *Skillern's Executors* v. *May's Executors*, 6 Cranch, 267, it appears that after the reversal by this court of a decree of the Circuit Court of the United States for the District of Kentucky, and after the cause was remanded to the court below, it was discovered to be one not within the jurisdiction of that court. The question arose whether the court could dismiss the action for want of jurisdiction, after this court had acted thereon. It was held that "the merits of the cause having been finally decided by it, and its mandate requiring only the execution of its decree, the Circuit Court was bound to carry that decree into execution, although the jurisdiction of that court be not alleged in the pleadings."

In *Cameron* v. *McRoberts*, 3 Wheat. 591, a suit brought in the District Court of Kentucky, then having the jurisdiction of a Circuit Court, the pleadings stated that McRoberts, the plaintiff, was a citizen of Kentucky, and that the defendant Cameron was a citizen of Virginia. The citizenship of other defendants was not stated. The defendants all appeared and answered, and a decree was pronounced for McRoberts. Subsequently Cameron filed a bill of review, and moved to set aside the decree and to dismiss the suit, "because the want of jurisdiction appeared on the record," and upon the allegation that the parties to the bill were all citizens of Kentucky. It was held that the court below had not power over its decree, so as to set the same aside on motion after the expiration of the term at which it was rendered, and that if a joint interest vested in Cameron, and the other defendants, the court had no jurisdiction over the cause, although jurisdiction could be exercised as to Cameron, if a distinct interest vested

in him, so that substantial justice, so far as he was interested, could be done without affecting the other defendants.

In *McCormick* v. *Sullivant*, 10 Wheat. 192, 199, certain defendants filed a plea in bar to a suit brought against them, setting up the proceedings and decree in a former suit brought by the plaintiffs in the District Court of Ohio, exercising the powers and jurisdiction of a Circuit Court. A special replication to this plea was filed, setting forth the record of the former suit, and alleging that the proceedings in that suit were *coram non judice*, the record not showing that the complainants and defendants in that suit were citizens of different States. This court said that the reason assigned in the replication why the former decree could not operate as a bar " proceeds upon an incorrect view of the character and jurisdiction of the inferior courts of the United States. They are all of limited jurisdiction; but they are not, on that account, inferior courts, in the technical sense of those words, whose judgments, taken alone, are to be disregarded. If the jurisdiction be not alleged in the proceedings, their judgments and decrees are erroneous, and may, upon a writ of error or appeal, be reversed for that cause. But they are not absolute nullities." It was, therefore, held that the decree in the first suit, whilst it remained unreversed, was a bar to the last suit as to the defendants who were also parties to the first suit.

In *Ex parte Tobias Watkins*, 3 Pet. 193, 207, Chief Justice Marshall said that " it is universally understood that the judgments of the courts of the United States, although their jurisdiction be not shown in the pleadings, are yet binding on all the world," and that an " apparent want of jurisdiction can avail the party only on a writ of error."

Similar views were expressed in *Bank of the United States* v. *Moss*, 6 How. 31, 39, and *Des Moines Nav. Co.* v. *Iowa Homestead Co.*, 123 U. S. 552, 557, 559, in the latter of which cases it was said that " although the judgments and decrees of the Circuit Courts might be erroneous, if the records fail to show the facts on which the jurisdiction of the court rested, such as that the plaintiffs were citizens of different States

from the defendant, yet they were not nullities, and would bind the parties until reversed or otherwise set aside."

These cases establish the doctrine that, although the presumption in every stage of a cause in a Circuit Court of the United States is that the court is without jurisdiction unless the contrary affirmatively appears from the record, *Börs* v. *Preston*, 111 U. S. 252, 255, and the authorities there cited, yet, if such jurisdiction does not so appear, the judgment or final decree cannot, for that reason, be collaterally attacked, or treated as a nullity.

These authorities, above cited, it is said, do not meet the present case, because the ground on which, it is claimed, the Federal court assumed jurisdiction was insufficient in law to make this case one arising under the laws of the United States. But that was a question which the Circuit Court of the United States was competent to determine in the first instance. Its determination of it was the exercise of jurisdiction. Even if that court erred in entertaining jurisdiction, its determination of that matter was conclusive upon the parties before it, and could not be questioned by them or either of them collaterally, or otherwise than on writ of error or appeal to this court. As said in *Des Moines Nav. Co.* v. *Iowa Homestead Co.*, above cited, if the Circuit Court "kept the case when it ought to have been remanded, or if it proceeded to adjudicate upon matters in dispute between two citizens of Iowa, when it ought to have confined itself to those between the citizens of Iowa and the citizens of New York, its final decree in the suit could have been reversed, on appeal, as erroneous, but the decree would not have been a nullity. To determine whether the suit was removable in whole or in part or not, was certainly within the power of the Circuit Court. The decision of that question was the exercise and the rightful exercise of jurisdiction, no matter whether in favor of or against taking the cause. Whether its decision was right, in this or any other respect, was to be finally determined by this court on appeal."

This disposes of the first objection urged against the decree in the Federal court under which Dowell purchased. That

decree cannot be treated, in this suit, as void for want of jurisdiction.

2. We now proceed to consider what effect should be given to the decree and proceedings in the suit in the Federal court. Although the bill in that suit refers to various deeds executed by Jesse Applegate and wife for lands that Dowell sought to have sold, and charged that they were made with the intent to delay and defraud both the State of Oregon and Dowell, the fundamental question presented was whether the lands themselves, fully identified by the pleadings, could be rightfully sold in satisfaction of Dowell's demands. To that issue, directly made, Daniel W. Applegate was a party. He met all the material allegations of Dowell's bill by denials that put upon the latter the burden of showing that he was entitled to the relief sought by him. The issue thus made was determined adversely to Applegate as to some of those lands.

The court, as we have seen, adjudged that on and prior to April 19, 1869, Jesse Applegate was the owner in fee of 121.55 acres of the north half of said donation claim, and that the deeds of April 19 and 20, 1869, from Jesse Applegate to W. H. H. Applegate and Daniel W. Applegate, covering said 121.55 acres, were voluntary, without consideration, and in fraud of the rights of Dowell, and, therefore, as to him and his assigns, null and void. It was further adjudged that all the interest of Jesse Applegate, on the 1st of January, 1869, in that 121.55 acres (and in other lands referred to in the decree) be sold by the master commissioner of the court. It cannot be said that this decree was not within the scope of the pleadings in the suit in the Federal court. And it certainly covered the lands now in dispute, for it is admitted that the 40 acres described in the deed of October 8, 1874, from W. H. H. Applegate to the present plaintiff are part of the 121.55 acres directed by the decree of the Federal court to be sold, and which was, in fact, sold — Dowell becoming the purchaser.

Upon what principle can it be held that that decree, being unmodified and unreversed, does not conclude the parties to the suit in which it was rendered, in respect to the liability

of the lands described in it for the demands of Dowell as ascertained and settled by the court? It is said that the deed of October 8, 1874, under which Daniel W. Applegate claims the 40 acres, was not distinctly put in issue by the pleadings or determined by the decree. But its validity was involved in the larger question presented by the pleadings as to the right of Dowell to subject to his demands the interest of Jesse Applegate in all the lands referred to,— those covered by donation claim numbered thirty-eight, and those not within that claim. The decree directing the sale of all the interest of Jesse Applegate in the 121.55 acres on the 1st of January, 1869, was an adjudication, as between Dowell and the defendants in that suit who asserted title to those lands, that no claim asserted by either of them could stand against the right of Dowell to have those lands sold.

It is disclosed by the present suit that when Daniel W. Applegate answered Dowell's bill he held the deed of October 8, 1874. If Daniel W. Applegate became, when taking that deed, a *bona fide* purchaser of the 40 acres of land now in dispute, and if the title so acquired was superior to Dowell's right to have that land sold for his demands against Jesse Applegate, it behooved him to assert that title in defence of the suit brought against him. The very nature of that suit required him to assert whatever interest he then had in the lands or any part of them that was superior to any claim of Dowell upon them, whether by judgment liens or in any other form. So far from pursuing that course, he forebore — purposely, as may now be inferred — to claim anything in virtue of the deed of October 8, 1874, and long after the decree under which Dowell purchased, he comes forward with a new, independent suit, based alone upon that deed, as giving him a superior title. His object is — certainly, the effect of his suit, if it be sustained, will be — to retry the issues made in Dowell's suit so far as they involved the latter's claim to have the 40-acre tract subjected to his demands. The decree in the Federal court was an adjudication, as between all the parties to the suit in that court, that Dowell was entitled in satisfaction of his

claims against Jesse Applegate, to subject to sale *all* the lands his bill sought to reach, which the decree directed to be sold. And that decree, never having been modified by the court that rendered it nor by this court upon appeal, necessarily concludes every matter that Daniel W. Applegate was entitled, under the pleadings, to bring forward in order to prevent the sale of the lands claimed by him, by whatever title. Having remained silent as to the deed of October 8, 1874, and having allowed the suit in the Federal court to proceed to final decree upon the question as to whether the lands described in the bill could be subjected to Dowell's demands — which description included the 40 acres here in dispute — and having been defeated upon that issue, and the decree having been fully executed, he cannot have the same issue retried in an independent suit based solely upon a title that he was at liberty to set up, but chose not to assert, before the decree was rendered.

The argument to the contrary seems to rest principally, if not altogether, upon the ground that the present suit is upon a cause of action entirely different from that presented in the suit in the Federal court. In that view, our attention is called to the cases of *Cromwell* v. *County of Sac*, 94 U. S. 351, *Russell* v. *Place*, 94 U. S. 606, and *Bissell* v. *Spring Valley Township*, 124 U. S. 225, 231. Those cases hold that a judgment by a court of competent jurisdiction as to parties and subject-matter is a finality in respect to the claim or demand in controversy, "concluding parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." "Thus, for example," the court said in *Cromwell* v. *County of Sac*, "a judgment rendered upon a promissory note is conclusive as to the validity of the instrument and the amount due upon it, although it is subsequently alleged that perfect defences actually existed, of which no proof was offered, such as forgery, want of consideration, or payment. If such defences were not presented in the action and established by competent evidence, the subsequent allega-

tion of their existence is of no legal consequence. The judgment is as conclusive, so far as future proceedings at law are concerned, as though the defences never existed." In that case it was further held — and the same principle was announced in the other cases — that "where the second action, between the same parties, is upon a different claim or demand, the judgment in the prior action operates as an estoppel only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." To the same effect were prior decisions of this court. *Hopkins* v. *Lee*, 6 Wheat. 109, 113; *Smith* v. *Kernochen*, 7 How. 198, 217; *Pennington* v. *Gibson*, 16 How. 65, 77; *Lessee of Parrish* v. *Ferris*, 2 Black, 606, 609. And the same doctrines' were subsequently reaffirmed in *Lumber Co.* v. *Buchtel*, 101 U. S. 638, 639, and *Stout* v. *Lye*, 103 U. S. 66, 71, and, at the present term, in *Johnson Company* v. *Wharton Company, ante,* 252. To these we may add the case of *Stockton* v. *Ford,* 18 How. 418, 420, in which it was said: "One of the questions now sought to be agitated again is precisely the same as this one in the previous suit, namely, the right of the plaintiff to the judicial mortgage under the execution and sale against Prior. The other is somewhat varied; namely, the equitable right or interest in the mortgage of the plaintiff, as the attorney of Prior, for the fees and costs provided for in the assignment to Jones. But this question was properly involved in the former case, and might have been there raised and determined. The neglect of the plaintiff to avail himself of it, even if it were tenable, furnishes no reason for another litigation. The right of the respective parties to the judicial mortgage was the main question in the former suit. That issue, of course, involved the whole or any partial interest in the mortgage. We are satisfied, therefore, that the former suit constitutes a complete bar to the present."

So far from the above cases sustaining the decision of the Supreme Court of Oregon, they support the views we have expressed. The present suit is not a second one between the same parties, upon a different claim or demand. It seeks, by additional evidence, to reopen the controversy that arose, and

was determined, in the suit in the Federal court as to the right of Dowell to have all the lands described in his bill subjected to his claims. While the position of the parties is reversed, Daniel W. Applegate, who contested that right, in the suit of the Federal court, — so far as that suit related to the lands then claimed by him, including the 40 acres here in dispute, — seeks, under the guise of a new suit, to obtain a reexamination of that question. And he seeks such reëxamination, not upon any ground of fraud in obtaining that decree, but in the light simply of the conveyance of October 8, 1874, from W. H. H. Applegate, which conveyance, although existing before Dowell commenced his suit, indeed, before Dowell acquired any judgement lien of record, he deliberately refrained from bringing to the attention of the Federal court, in some appropriate form, in support of his defence. The presenting in this suit of the fact of that conveyance, for the purpose of showing that the 40 acres in question should not have been subjected to sale for Dowell's demands, does not, within the rule announced in the cases above cited, make a different claim or demand. On the contrary, the matter now presented was embraced by the issues in the suit in the Federal court, and was there determined, when that court, upon final hearing, adjudged that the 121.55 acres (which embraced the 40 acres now in dispute) should be sold to pay Dowell's claims. This case, consequently, comes within the rule, that "a judgment estops not only as to every ground of recovery or defence actually presented in the action, but also as to every ground which might have been presented."

For the reasons given we are unable to concur in the views expressed by the state court as to the effect to be given to the decree of the Federal court. We are of opinion that due legal effect is not accorded to it, unless it be adjudged, as this court does now adjudge, that never having been modified and being in full force and unreversed when the present suit was instituted, that decree conclusively establishes, as between Dowell and Daniel W. Applegate, that the former was entitled to have the lands, now in dispute, sold for his demands; and,

consequently, that the title acquired by Dowell, under that decree, cannot be here questioned by Applegate.

Under this view, it is immaterial that Dowell did not, in the present case, offer evidence in support of the allegations of fraud against Jesse Applegate in respect to the various deeds made by him, and to which reference was made in the suit and decree in the Federal court. That decree being conclusive, as between Dowell and Daniel W. Applegate, of the question now presented, it was not incumbent upon Dowell to introduce any evidence in this case beyond the record of the former suit.

We are of opinion that the Supreme Court of Oregon failed to give proper effect to the decree and proceedings in the Circuit Court of the United States for the District of Oregon, and erred in not reversing the final judgment of the Circuit Court of Douglas County, with directions to dismiss the complaint of Applegate.

*The decree is, therefore, reversed, and the cause remanded for further proceedings in conformity with this opinion.*

MR. JUSTICE FIELD dissented from the judgment in this case.